# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABEL P. REYES,<br><br>              Plaintiff,<br><br>    v.<br><br>FLORES, et al.,<br><br>              Defendants. | **Case No. 1:16-cv-00586-DAD-JLT (PC)**<br><br>**FINDINGS AND RECOMMENDATION TO DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND TO DISMISS JOHN DOE R.N. FOR PLAINTIFF'S FAILURE TO PROSECUTE (Docs. 35, 39)**<br><br>**OBJECTIONS DUE WITHIN 14 DAYS** |

### I. Procedural History

Plaintiff claims that, in deliberate indifference to his serious medical needs, Defendant M. Flores LVN, knowingly denied him medical treatment when he began experiencing pain and bleeding following surgery for an enlarged prostate. (Doc. 1, 10-12.) Defendant contends that he was not deliberately indifferent to Plaintiff's medical needs and that, even if Plaintiff needed further medical care, ordering it was beyond his job duties, entitling him to summary judgment. (Doc. 35.) For the reasons discussed below, the Court finds that Plaintiff's evidence established genuine issues of material fact and Defendant's motion should be **DENIED.**

### II. Plaintiff's Allegations

Plaintiff alleges that, following prostate ("TURP") surgery, he was discharged to the ACH at CSP-Cor on January 23, 2014 with a prescription for medications and directions from the

1

surgeon for Plaintiff to report to a physician or emergency room if his symptoms returned or worsened. (Doc. 1, p. 16-17.)

Plaintiff next alleges that, on January 26, 2014, at approximately 7:00 a.m., he was pushed in a wheelchair to the clinic to pick up his morning medications at which time he informed Defendant that he was in severe pain in his bladder and kidneys and that he was leaking blood from his penis. (*Id.*, p. 18.) Defendant responded that it was not a medical emergency, that the red on his boxers was not blood but Kool-Aid, and told him to submit a health care services request form to be seen. (*Id.*)

Plaintiff was wheeled back to his building where he and the person pushing his wheelchair informed C/O Huewe and the control booth officer that he was in pain and that medical staff were not responsive, to which the control booth officer indicated that he would let Plaintiff go back to medical at noon. (*Id.*) Around 11:30 a.m., the assistant wheeled Plaintiff back to the clinic where he was again seen by Defendant and told him of his continuing pain as well as that he was unable to urinate, had thick blood clots come out of his penis, and that he had just had surgery and needed medical attention. (*Id.*, p. 19.) Defendant ignored Plaintiff's pleas. (*Id.*) LVN Hamilton was also present for this exchange but did nothing. (*Id.*)

When Plaintiff and the assistant pushing his wheelchair arrived back at Plaintiff's building they again relayed what happened to the control booth officer and C/O Huewe who asked if Plaintiff wanted them to hit the alarm to which Plaintiff responded in the affirmative. (*Id.*) LVN Hamilton and Defendant responded to the alarm and Defendant again stated that it was Kool-Aid, not blood on Plaintiff's boxers and told custody staff that Plaintiff could go back to his cell and wait to see the nurse the next day. (*Id.*, pp. 19-20.) C/O Huewe escorted Plaintiff back to his cell and Plaintiff told him that he was in severe pain, dripping blood clots from his penis, and was unable to urinate, but C/O Huewe responded that medical had already seen Plaintiff, so there was nothing more he could do. (*Id.*, p. 20.)

On third watch, Plaintiff reported his problems to other floor staff officers (not named as defendants) who let him call his mother; she called the hospital where Plaintiff's surgery was performed. (*Id.*, p. 21.) At approximately 3:45 p.m., Plaintiff was seen at the clinic by John Doe

RN, whom Plaintiff told of his surgery, severe pain, and that Plaintiff had used a catheter trying to release his urine, but only blood clots came out. (*Id.*) John Doe RN looked and told Plaintiff he did not see any blood on his penis and told Plaintiff to see a nurse the next day. (*Id.*) When Plaintiff protested and asked John Doe RN "Why not do something now?" John Doe RN simply responded, "I'm done." (*Id.*) When he returned to his cell, Plaintiff again called his mother and eventually a nurse from the hospital called CSP-Cor and told medical staff that Plaintiff was having a medical emergency which resulted in his return to the hospital at approximately 10:00 that evening. (*Id.*, pp. 21-22.)

### III. <u>Summary Judgment Standard</u>

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Washington Mutual Inc. v. U.S.*, 636 F.3d 1207, 1216 (9th Cir. 2011). An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.,* 818 F.2d 1422, 1436 (9th Cir. 1987). The Court determines only whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a *pro se* prisoner. *Thomas v. Ponder*, 611 F3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

In addition, Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that claim. Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted). The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same. *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F.Supp.2d 1192, 1200 (S.D. Cal. 1998).

Each party's position must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2)

showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *accord Simmons v. Navajo County, Ariz.,* 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendants do not bear the burden of proof at trial and, in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If Defendants meet their initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp.,* 627 F.3d at 387 (citing *Celotex Corp.,* 477 U.S. at 323). This requires Plaintiff to "show more than the mere existence of a scintilla of evidence." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).

In judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, *Soremekun v. Thrifty Payless Inc.,* 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted), *cert. denied*, 132 S.Ct. 1566 (2012). Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

///

4

## IV. Discussion and Analysis

### A. Legal Standard Under the Eighth Amendment

Prison officials violate the Eighth Amendment if they are "deliberate[ly] indifferen[t] to [a prisoner's] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "A medical need is serious if failure to treat it will result in '"significant injury or the unnecessary and wanton infliction of pain."'" *Peralta v. Dillard*, 744 F.3d 1076, 1081-82 (2014) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir.2006) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir.1992), overruled on other grounds by *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir.1997) (en banc)).

To maintain an Eighth Amendment claim based on medical care in prison, a plaintiff must first "show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendants' response to the need was deliberately indifferent." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (quoting *Jett*, 439 F.3d at 1096 (quotation marks omitted)).

As to the first prong, indications of a serious medical need "include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (citation and internal quotation marks omitted); *accord Wilhelm*, 680 F.3d at 1122; *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000). Neither side appears to dispute that Plaintiff's condition after TURP surgery qualifies as a serious medical need.

As to the second prong, deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.' " *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (quoting *Whitley*, 475 U.S. at 319). Deliberate indifference is shown where a prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.*, at 847. In medical cases, this requires showing: (a) a purposeful act or failure to respond to a

prisoner's pain or possible medical need and (b) harm caused by the indifference. *Wilhelm*, 680 F.3d at 1122 (quoting *Jett*, 439 F.3d at 1096). "A prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs." *Jett,* 439 F.3d at 1096, citing *McGuckin*, 974 F.2d at 1060.

Deliberate indifference is a high legal standard. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir.2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.' " *Id.* at 1057 (quoting *Farmer*, 511 U.S. at 837). "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" *Id.* (quoting *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1188 (9th Cir. 2002)).

To prevail on a deliberate-indifference claim, a plaintiff must also show that harm resulted from a defendant's wrongful conduct. *Wilhelm*, 680 F.3d at 1122; *see also Jett*, 439 F.3d at 1096; *Hallett v. Morgan*, 296 F.3d 732, 746 (9th Cir. 2002) (prisoner alleging deliberate indifference based on delay in treatment must show delay led to further injury). The needless suffering of pain may, in some circumstances, be sufficient to demonstrate further harm, *Wilhelm*, 680 F.3d at 1122; *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir.2002) ) (on a claim of prolonged exposure to pepper-spray fumes found "a serious medical need is present whenever the 'failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain," ' " (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir.1992) (quoting *Estelle*, 429 U.S. at 104)).

**B.     Defendant's Undisputed Statements of Fact[1]**

Defendant's evidence shows that in January of 2014, Plaintiff was incarcerated at California State Prison – Corcoran. (Defendant's Separate Statement of Undisputed Material Facts ("DUF") 1.) Following a history of treatment for various urinary symptoms, Plaintiff was

---

[1] Disputes of fact shown by Plaintiff's evidence are delineated in the discussion of his opposition.

admitted into the Delano Regional Medical Center for TURP surgery on his prostate on January 21, 2014. (DUF 2.) Plaintiff was discharged and returned to CSP-Cor on January 23, 2014. (DUF 3.)

On January 26, 2014 at approximately 7:00 a.m., Plaintiff was pushed in his wheelchair to the C-window of the 3-B Clinic to obtain his morning medications from Defendant. (DUF 4.) According to Plaintiff, Defendant "doesn't examine you, he just only passes out medication." (DUF 5.) Defendant contends that Plaintiff refused to take his medications on January 26, 2014. (DUF 8.) Plaintiff told Defendant that he was in severe pain and that he had a medical emergency. According to Plaintiff, Defendant instructed Plaintiff to complete a Health Care Services Request Form, CDC Form 7362. (DUF 6.) Shortly thereafter, Plaintiff went to another window at the 3-B Clinic and spoke with another nurse who also advised Plaintiff to complete a 7362 form and drop it in the box. (DUF 7.)

At approximately 10:00 a.m., Plaintiff returned to his cell and completed a 7362 form. However, he did not put it in the box at that time. (DUF 9.) Plaintiff returned to the C-window at approximately 11:30 a.m. for his medications. (DUF 10.) According to Plaintiff, when he again tried to speak with Defendant about his symptoms, Defendant advised Plaintiff that he already gave Plaintiff a 7362 form to complete. (DUF 11.)

Plaintiff returned to his cell where he advised custodial staff of his alleged medical emergency and asked that they "hit the alarm." (DUF 12.) Nurse Hamilton and Defendant responded to the alarm. Defendant took Plaintiff's vital signs and attempted to assess Plaintiff's condition. The chart notes that Plaintiff was able to walk without difficulty or grimacing, and that Plaintiff was not showing any pain symptoms. (DUF 13.) Nurse Hamilton and Defendant spent approximately 15-30 minutes with Plaintiff, assessing his condition. (DUF 14.)

Pursuant to protocols, Defendant called the Triage and Treatment Area (TTA) and spoke with a registered nurse (RN) regarding Plaintiff's condition. The RN then makes the decision as to whether the inmate needs to be examined. In this case, the RN advised Defendant that Plaintiff did not need to be examined. The RN advised Defendant to give Plaintiff a 7362 form, so that he could be examined the next day. (DUF 15.)

7

Licensed vocational nurses (LVN), such as Defendant, do not have the authority to decide whether an inmate should be examined. That decision must be made by the RN. Defendant never refused medical service to Plaintiff. Only the RNs and higher ranking medical staff have the authority to make that decision. (DUF 16.)

Plaintiff returned to the 3-B clinic at approximately 3:45 p.m. Nurse John Doe examined Plaintiff and concluded that he did not require emergency treatment. (DUF 17.) Later in the evening on January 26, 2014, Dr. Julian Kim examined Plaintiff in the Acute Care Hospital at California State Prison – Corcoran. The chart indicates that Plaintiff complained of bladder pain, the inability to void, chest pain, and shortness of breath. Dr. Kim also noted that Plaintiff did not appear to be in any acute physical distress. The chart also indicated that "history taking is nearly impossible due to the patient's extreme uncooperativeness." Plaintiff was sent to the Mercy Hospital Emergency Room due to the inability to adequately monitor Plaintiff's cardiac complaints or perform a full urological examination. (DUF 18.)

Plaintiff was examined by Dr. Noor Jaber at the Mercy Hospital Emergency Room. The chart indicates that Plaintiff was in no acute distress. A Foley catheter was placed and Plaintiff was admitted for further management and treatment. (DUF 19.) Plaintiff was discharged from Mercy Hospital on January 29, 2014. The discharge report indicates that urine cultures were negative. The report also indicates that Plaintiff was "very manipulative refusing medications, and he is self-treating his issues as nothing can be offered." (DUF 20.)

### C. Defendant's Motion

Defendant argues that his observations support the finding, he was not aware that Plaintiff faced a substantial risk of serious harm. As noted in Plaintiff's medical records, Plaintiff was not showing signs or symptoms of acute distress or pain. (Doc. 35, p. 9; *ref.* DUF 13, 18, 19.) Defendant argues that he first encountered Plaintiff while working at one of the windows in the 3-B clinic where Defendant was distributing medication. At that time, neither Defendant nor the unnamed nurse in another window believed that Plaintiff was facing a medical emergency.

Defendant next examined Plaintiff in his cell when responding to the alarm requested by Plaintiff. After taking Plaintiff's vital signs and spending 15 to 30 minutes with Plaintiff, both

Defendant and Nurse Hamilton observed that Plaintiff could walk without difficulty or grimacing, and that Plaintiff was not showing any pain symptoms. (Doc. 35, p. 9, *ref.* DUF 13, 14.)

Defendant argues that these observations are further supported by the reports prepared by Dr. Julian Kim and Dr. Noor Jaber later the same day who noted that Plaintiff did not appear to be in any acute distress. (*Id.*, *ref.* DUF 18, 19.) Considering these independent observations, Defendant argues that he had no reason to believe Plaintiff faced a substantial risk of serious harm. Even if Defendant should have known Plaintiff face a substantial risk of serious harm, Defendant contends he was not aware of such a risk and, as a result, cannot be held liable for deliberate indifference. *See Gibson, supra*, 290 F.3d at 1188.

In any event, Defendant contends that as an LVN, he does not have the authority to decide whether an inmate should be examined. That decision must be made by the RN. Pursuant to protocols, Defendant called the TTA and spoke with an RN regarding Plaintiff's condition. In this case, the RN advised Defendant that Plaintiff did not need to be examined. The RN advised Defendant to give the inmate a Health Care Services Request Form CDC 7362, so that he could be examined the next day. (Doc. 35, p. 9, *ref.* DUF 15.)

Defendant also argues that a difference in opinion between medical professionals concerning what medical care is appropriate does not amount to deliberate indifference. *Colwell, supra,* 763 F.3d at 1068. Likewise, he correctly argues that a difference in medical opinion between a prisoner-patient, especially one without any medical training, and a healthcare provider in treatment options does not give rise to an Eighth Amendment claim. (Doc. 35, p. 10 (citing *Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970); *Shields v. Kunkle*, 442 F.2d 409, 410 (9th Cir. 1981)).

Defendant argues that Plaintiff's allegations amount to nothing more than a disagreement with Defendant and the RN who determined that Plaintiff's condition did not constitute a medical emergency, which was the conclusion reached by numerous other nurses at CSP-Cor on the date in question. Likewise, Defendant contends that even when Plaintiff was examined at the emergency room following his complaints of chest pain, the doctor noted that Plaintiff was in no acute distress. As a result, Defendant argues Plaintiff cannot support a claim for deliberate

9

indifference against Defendant. (Doc. 35, p. 10.)

The Court finds that Defendant has met his burden to demonstrate the absence of a genuine issue of material fact. The burden therefore shifts to Plaintiff to establish that a genuine issue as to any material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Plaintiff may not rely upon the mere allegations or denials of his pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of his contention that the dispute exists. Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11; *First Nat'l Bank,* 391 U.S. at 289; *Strong v. France*, 474 F.2d 747, 749 (9th Cir. 1973).

### D.     **Plaintiff's Opposition**

In his opposition, Plaintiff argues that, on January 26, 2014, Plaintiff's post-surgical condition constituted a serious medical need which he repeatedly brought to Defendant's attention. Despite both Plaintiff's objective (bloodied underwear/shorts and blood dripping from his penis) and subjective pain complaints, Defendant was deliberately indifferent to Plaintiff's condition. (Doc. 45.)

Plaintiff's evidence shows that at approximately 7:00 a.m. on Sunday, January 26, 2014, Plaintiff's ADA assistant, IM Jonnie Quezada, pushed Plaintiff in a wheelchair to the C-window to obtain Plaintiff's morning medications. (Doc. 45, Plntf. Decl., ¶4.) Defendant attended the C-window at that time. (*Id.*) The parties agree that this is the first encounter they had with each other on January 26, 2014. Defendant's evidence of this encounter merely indicates that he spoke with Plaintiff and that Plaintiff declined to take his medications and signed a Refusal of Examination and/or Treatment Form confirming his refusal. (Doc. 35-3, Def. Decl., ¶3.)

Plaintiff's evidence to the contrary shows that, at that encounter, Plaintiff informed Defendant that he had recently had surgery, that he was in severe pain and was bleeding/discharging blood and had blood on his boxers. (Doc. 45, Plntf. Decl., ¶6.) Plaintiff told Defendant he was having complications from surgery, had heavy bleeding and clots. (*Id.*) Defendant told Plaintiff to fill out a 7362 form, that Plaintiff's condition was not a medical emergency, and that he could see the doctor the next day, Monday. (*Id.*) Defendant did not fill

10

out any documentation of this interaction. (Doc. 45, Plaintiff's Disputed Material Facts and cited supporting evidence, "PDF" 6.)

Plaintiff's evidence also shows that, after the medication line ended that morning, the ADA worker brought Plaintiff to Defendant's window again. (PDF 7, 9.) Plaintiff pleaded with Defendant and told Defendant that he was in pain and it hurt, to which Defendant responded that he already gave Plaintiff a 7362 form to fill out. (*Id.*) When Plaintiff persisted, Defendant told him there was no doctor or nurse available for him to call on Plaintiff's behalf. (*Id.*) Plaintiff told Defendant that there had to be at least an RN at the ACH 24/7 and that a doctor had to be available to the RN, so all Defendant had to do was pick up the phone and let them know of Plaintiff's symptoms. (*Id.*) The ADA worker also told Defendant that Plaintiff had recently had surgery, was in severe constant pain, leaking blood clots, unable to urinate, and that blood was leaking onto Plaintiff's boxers. (*Id.*) Defendant failed to respond to either Plaintiff or the ADA worker's imploring. (*Id.*) When Plaintiff showed Defendant his bloody boxers, Defendant came out from behind the C-window to look at them and dismissed Plaintiff's complaints saying, "Oh that's not blood, that's Kool-Aid." (*Id.*)

Furthermore, Plaintiff submits evidence to show that he did not sign the Refusal of Examination and/or Treatment Form as Defendant contends. (PDF, #8.) Plaintiff states that he did not sign that form and submits other documents which he acknowledges signing for signature comparison purposes. (*Id.*, Doc. 45, Exh. F.) While the signatures are similar, they are not identical. Thus, a dispute of fact exists whether Plaintiff signed the Refusal of Examination and/or Treatment Form, on January 26, 2014, as Defendant contends.

Plaintiff's evidence also shows that after the two conversations at the C-window, when the ADA worker pushed Plaintiff in his wheelchair back to his housing unit, Plaintiff and the ADA worker told Officers Huewe and Alford that Defendant did not want to respond to Plaintiff's medical emergency. (PDF 9.) Officer Alford told them that he would let them go back to the 3B-Clinic around noon. (Doc. 45, Quezada Decl., ¶6.) Thus, Plaintiff and the ADA worker returned to the C-window of 3B-Clinic around 11:30 a.m. at which time Plaintiff again stressed his dire condition to Defendant and asked to be sent to the ACH or to see a nurse or physician, but

11

Defendant just responded that he had already given Plaintiff a 7362 form and that Plaintiff could see a physician the next day. (PDF 11.) When Plaintiff approached LVN Hamilton in the 3B-Clinic about his circumstance, LVN Hamilton merely indicated he had already spoken to Defendant, (*id.*), which, leniently construed, implies that the contents Defendant's conversation with LVN Hamilton caused the latter to assume Plaintiff's symptoms were being addressed.

Plaintiff's evidence also shows that when the ADA worker pushed Plaintiff back to his building, they informed Officer Huewe and Alford about Plaintiff's condition. (PDF 12.) Officer Alford asked, "what do you want us to do, hit the alarm?" to which Plaintiff responded "yes." (*Id.*) Defendant and LVN Hamilton responded to the alarm. (PDF 13.) Plaintiff's evidence shows that upon arrival, Defendant stated to Plaintiff "So this is how you want to play this game?" (*Id.*) Plaintiff responded that he needed to see a doctor or go back to the outside hospital because he was in pain and it hurt, to which Defendant did not respond. (Plntf. Decl., ¶11.) Defendant also again brushed off the blood on Plaintiff's boxers as Kool-Aid. (Quezada Decl., ¶8.) When the ADA worker returned Plaintiff to the housing unit after the exam, Officer Huewe was standing by Plaintiff's cell and they both saw blood leak from Plaintiff's penis. (*Id.*)

Plaintiff does not recall, but does not dispute that Defendant took Plaintiff's vital signs during his exam after the alarm was sounded. (Plntf. Decl., 12.) However, a dispute exists regarding Defendant's findings from that exam. Defendant contends that he noted Plaintiff could walk without difficulty or grimacing, and that he did not show any pain symptoms. (Def. Decl. ¶4.) However, the 7362 form shows that Plaintiff stated, "I'm pissing big blood clots, and heavily red blood," and had pain in his lower back. (Doc. 35-3, Def. Decl. Exh., p. 7; Doc. 45, Plntf. Exh. K, p. 104.) Under the objective findings, which Defendant apparently filled out, the form reflects:

> @ 1252, LVW Hamilton and [illegible] arrived to cell. I/M was sitting on edge of bed. I/M got up, when ask, walk to his w/c without difficulty or facial grimace. LVN Flores arrived approx. 1 min after the fact. Took V.S. as above, ~~call~~[2] I/M was not showing any pain symptoms, talking without hesitance. Sitting up in chair, Pt would bend over in chair when LVN would talk to him, get back up when not spoken to. Call RN [illegible] @ 1307, ACH aware of Pt. Told to tell I/M to put in paperwork and will see Monday.

(*Id.* (strike through word "call" in original).) Plaintiff presents evidence to contradict Defendant's note that he would bend over in the chair when one of the LVN's talked to him during this exam, but would get up when not spoken to, which Defendant suggest was done in an exaggerated effort to show pain. To the contrary, Plaintiff testified in his deposition that he was in a lot of pain at the time of this exam, that he was dizzy and bleeding and kneeled in pain. (Doc. 45, p. 110.) This creates a triable issue of fact whether Plaintiff was kneeling in pain, or just bending over in exaggeration during this exam.

Defendant's notes on the 7362 form raise questions. Notably, Defendant does not provide any explanation where he obtained the information that Plaintiff walked to his wheelchair "without difficulty or facial grimace" when he arrived about "1 minute after the fact." (*See* Doc. 35-3, Def. Decl.) Regardless of whether Plaintiff was exhibiting observable pain symptoms, Defendant does not acknowledge Plaintiff's complaints regarding bleeding and clotting or indicate whether he relayed this part of Plaintiff's complaints to the RN that he called that day. (*See* Doc. 35-3, Def. Decl.) Defendant does not provide any explanation to find that Plaintiff's complaint of "pissing big black clots and heavily red blood" should not equate to a serious medical condition given his recent TURP surgery.

Further, Plaintiff correctly points out that the 7362 form detailing this encounter, indicates Plaintiff's pulse rate is noted at "217" but a "1" appears to have been drawn through the "2" in an attempt to reflect "117" instead of "217" -- the later, higher number, Plaintiff contends was his pulse rate at that time. (Doc. 45, Plntf. Decl., ¶13; *id.*, Exh. K, p. 104; & Doc. 35-3, Exh to Def. Decl. p. 7.) Defendant did not address this apparent alteration/change of Plaintiff's medical record in his declaration, nor in any admissible evidence; nor did he file a reply to address Plaintiff's argument and evidence.

Neither party disputes that the exam on the afternoon of January 26, 2014, was the last contact that Defendant had regarding Plaintiff's condition. Subsequently, Plaintiff called his mother and informed her of the above and she called the Delano Regional Medical Hospital (where Plaintiff's TURP surgery had been performed). (Plntf. Decl., ¶16.) Eventually, Nurse

13

Campbell from Delano Regional called CSP-Cor which resulted in Plaintiff being taken to the ACH around 5:30 p.m. on January 26, 2014. (*Id.* ¶17.) Plaintiff's evidence shows that, at the ACH, a urinalysis showed blood in his urine with an abnormal finding of "LARGE" and "TURBID" appearance. (Doc. 45, p. 122.) The ACH report reflects that while Plaintiff's abdomen was soft, his bladder was "palpable and tender to touch." (*Id.*, p. 125.) Exam noted there was "fresh blood on the urethral meatus" and that Plaintiff was holding the catheterization on [sic] his hand with fresh blood inside. It was an attempt to self-catheterization prior to presentation." (*Id.*) Plaintiff's blood pressure was 149/90 and his pulse rate was 120. (*Id.*) The assessment/plan noted "lots of blood on self-catheterization. Possible urinary retention secondary to the accumulated blood clot in the bladder. Probably going to need emergent urological evaluation including ultrasound of his bladder to relieve retention since the patient could not void even using self-catheterization." (*Id.*) The ACH record also noted that Plaintiff complained of chest pain and had "elevated blood pressure with tachycardia," that two doses of nitroglycerine did not abate his chest pain, and Plaintiff "needed to be worked up especially in the setting of the tachycardia" and that the ACH had "no capacity to do the telemetry monitoring or the cardio workup as well as inability for urological consultation ***on an emergent basis***." (*Id.*, pp. 125-26 (emphasis added).)

It is notable that the ACH physician found both Plaintiff's urological and cardiological conditions emergent, warranting transfer to a hospital, while Defendant did not find Plaintiff's condition to be[2] significant enough to relay them to the RN, or if he did, he failed to note this on the 7362 form or to detail this in his declaration. Plaintiff's evidence also shows that at Mercy Hospital's emergency room, placing the Foley catheter resulted in "a lot of frank hematuria appreciated" noted as "drained gross blood" and that Plaintiff's pain and apparently his cardiac

---

[2] Defendant noted Plaintiff's blood-pressure as 148/82 and pulse rate at 217 or 117 on the 7362 form. At the ACH, he doctor noted his blood-pressure was 149/90 and pulse rate was 120 which, the doctor noted, was "elevated and tachycardia." The doctor found this, combined with Plaintiff's bleeding/clotting and inability to void, to be emergent such to warrant hospital transport, even though Plaintiff was noted not to appear to be in any acute distress. (*Compare* Doc. 35-5, p. 7 with Doc. 45, pp. 125-26.) Again, Defendant failed to explain that he relayed Plaintiff's cardiac readings to the RN on January 26, 2014 or explain why he did not do so.

symptoms as well, after the Foley catheter was placed. Also, when he was discharged three days later, his cardiac symptoms had resolved without further treatment and without pain medication. (Doc. 45, pp. 131, 138.)

On the evidence submitted, a reasonable jury could find that Defendant merely relayed statements such as contained in his declaration to the RN he called (i.e. that Plaintiff was able to walk without difficulty grimacing, and that he was not showing any pain symptoms), and not Plaintiff's complaints and the rest of the findings noted on the 7362 form, which the physician at the ACH found to require an emergent work-up and transport to a hospital. This being so, a reasonable jury could find that, in not relaying Plaintiff's complaints and all of the findings noted on the 7362 form, Defendant was deliberately indifferent to Plaintiff's serious medical condition. Furthermore, volume 4 of Chapter 12 of the CDCR Health Care Medical Services Policies and Procedures, demonstrates that Defendant had the ability to call an RN or physician despite that he told the plaintiff that none was on duty when Plaintiff presented at the C-window complaining of severe pain and bleeding. (Plntf. Decl. ¶15.) A reasonable jury could also find that any failure by Defendant to call an RN when Plaintiff presented with his complaints at the C-window and to relay all of Plaintiff's symptoms and vitals when Defendant spoke with the RN during the exam after the alarm was sounded, subjected Plaintiff to the unnecessary and wanton infliction of pain, which escalated to include cardiac symptoms by the time Plaintiff was seen by the physician at the ACH. *Wilhelm*, 680 F.3d at 1122.

Plaintiff also submits evidence that his inmate appeal determined that Defendant violated the emergency medical response system policy. (Doc. 45, pp. 72-75; Plntf. Decl. ¶15.) In noting this, the Court does not mean to suggest that violation of such policies and procedures without more demonstrates that Defendant was deliberately indifferent to an inmate's serious medical need. However, it does support the Court's conclusion that a jury could reasonably conclude in the plaintiff's favor.

Defendant contends it was beyond his job duties to order medical treatment for Plaintiff. It is true that when resolving a claim under the Eighth Amendment against individual defendants, causation must be resolved via "a very individualized approach which accounts for the duties,

15

discretion, and means of each defendant." *Leer v. Murphy*, 844 F.2d 628, 633-34 (9th Cir. 1988) *citing with approval Williams v. Bennett*, 689 F.2d 1370, 1384 (11th Cir. 1982) ("There can be no duty, the breach of which is actionable, to do that which is beyond the power, authority, or means of the charged party. One may be callously indifferent to the fate of prisoners and yet not be liable for their injuries. Those whose callous indifference results in liability are those under a duty -- possessed of authority and means -- to prevent the injury.") Nevertheless, it was not beyond Defendant's job duties to call an RN or the ACH and report Plaintiff's bleeding/clotting complaints in the morning of January 26, 2014. Indeed, this is what he did when examining Plaintiff after custody staff sounded the alarm before the third shift started.[3]

Thus, draw all inferences in the light most favorable to Plaintiff, *Comite de Jornaleros de Redondo Beach*, 657 F.3d at 942, the Court finds he has met his burden of establishing that triable issues of fact exist as to whether Defendant could have and should have called an RN or physician during their interactions at the C-window, and whether Defendant properly relayed all of Plaintiff's symptoms and vital statistics as reflected in the 7362 form to the RN on the phone on January 26, 2014, to defeat Defendant's motion for summary judgment. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.

## V. Dismissal of Defendant John Doe, R.N.

Rule 4(m) provides:

> If a defendant is not served within 120 days after the complaint is filed, the court - on motion or on its own after notice to the plaintiff - must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

In cases involving a plaintiff proceeding *in forma pauperis*, the Marshal, upon order of the Court, shall serve the summons and the complaint. 28 U.S.C. § 1915(d); Fed. R. Civ. P. 4(c)(3). "[A]n incarcerated *pro se* plaintiff proceeding *in forma pauperis* is entitled to rely on the U.S. Marshal for service of the summons and complaint and should not be penalized by having his action

---

[3] As discussed previously, there is a genuine issue of fact as to whether Defendant relayed all pertinent information on Plaintiff's condition to the RN during that call.

16

dismissed for failure to effect service where the U.S. Marshal or the court clerk has failed to perform his duties." *Walker v. Sumner*, 14 F.3d 1415, 1422 (9th Cir. 1994) (internal quotations and citation omitted), *abrogated on other grounds by Sandin v. Connor*, 515 U.S. 472 (1995). However, where a *pro se* plaintiff fails to provide the Marshal with accurate and sufficient information to effect service of the summons and complaint, the Court's *sua sponte* dismissal of an unserved defendant is appropriate. *Walker*, 14 F.3d at 1421-22.

At this juncture, Plaintiff has failed to submit any information identifying Defendant John Doe, RN for the Marshal's Office to even attempt to locate and serve him. *Walker*, 14 F.3d at 1421-22. This action has been pending for over two years. Plaintiff's time for identifying and serving Defendant John Doe, RN has been extended well beyond 120 days from the filing of the Complaint as allowed in Rule 4(m). While good cause initially existed to allow extension beyond the 120-day service deadline, there is no good cause to extend the time for service of Defendant John Doe, RN any further. It is Plaintiff's obligation to provide information necessary to identify and locate a given defendant. This Plaintiff has not done and it appears he is unable to do so.

In the screening order, Plaintiff was informed that the Federal Rules of Civil Procedure include no provision "permitting the use of fictitious defendants." *McMillan v. Department of Interior*, 907 F.Supp. 322, 328 D.Nev. 1995), *aff'd*, 87 F.3d 1320 (9th Cir. 1996), *cert. denied*, 519 U.S. 1132 (1997); *see also Fifty Associates v. Prudential Ins. Co.*, 446 F.2d 1187, 1191 (9th Cir. 1970). Plaintiff was further informed that "[a]s a general rule, the use of 'John Doe' to identify a defendant is not favored." *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980). Nonetheless, Plaintiff was afforded an opportunity to identify the unknown defendant through discovery, as it was not clear that discovery would not reveal John Doe RN's identity. *Id.* Plaintiff was cautioned in the screening order that he was required to identify John Doe RN by name to proceed on claims against him in this action. (Doc. 10, pp. 12-13.)

A court may dismiss a defendant, a claim, or an action with prejudice, based on a party's failure to prosecute an action or failure to obey a court order, or failure to comply with local rules. *See, e.g. Ferdik v. Bonzelet*, 963 F.2d 1258, 1260-61 (9th Cir. 1992) (dismissal for failure to comply with an order requiring amendment of complaint); *Malone v. U.S. Postal Service*, 833

F.2d 128, 130 (9th Cir. 1987) (dismissal for failure to comply with a court order); *Henderson v. Duncan*, 779 F.2d 1421, 1424 (9th Cir. 1986) (dismissal for failure to prosecute and to comply with local rules). The deadline to amend pleadings, (Doc. 20), and the discovery cut-off deadline (Doc. 31) have passed without Plaintiff filing anything to indicate that he has ascertained the true name of John Doe RN to prosecute.

On December 22, 2017, the Court ordered Plaintiff to show cause why Defendant John Doe, RN and all claims against him should not be dismissed with prejudice for Plaintiff's failure to prosecute this action against John Doe RN by identifying and substituting his true name in this action. (Doc. 39.) Despite lapse of nearly eight months since that order issued, Plaintiff has failed to provide any additional information to identify Defendant John Doe, RN for service or to otherwise prosecute this action against him.

## VI. <u>Conclusions and Recommendations</u>

As set forth herein, this Court finds that Plaintiff has established a dispute of material fact to prevent granting Defendant's motion for summary judgment. Further, Plaintiff has failed to provide sufficient information upon which to identify and locate Defendant John Doe, RN for service of a summons in this action and has failed to prosecute this action against him, requiring dismissal. Accordingly, the Court **RECOMMENDS**:

(1) Defendant LVN M. Flores is not entitled to judgment as a matter of law and his Motion for Summary Judgment, filed on December 20, 2017 (Doc. 35), should be **DENIED**;

(2) Defendant John Doe RN should be **DISMISSED** with prejudice based on Plaintiff's failure to prosecute;

(3) the Clerk should be directed to rename this action "Reyes v. Flores" and to terminate John Doe RN from the docket; and

(4) the parties should be ordered to participate in a settlement conference and to indicate whether they will require court supervision.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). **Within 14**

1 **days** after being served with these Findings and Recommendations, the parties may file written
2 objections with the Court. The document should be captioned "Objections to Magistrate Judge's
3 Findings and Recommendations." The parties are advised that failure to file objections within the
4 specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834,
5 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

    Dated: **August 16, 2018**         **/s/ Jennifer L. Thurston**
                                                           UNITED STATES MAGISTRATE JUDGE